UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

| | |
|---|---|
| FRONTIER HOME HEALTH AND HOSPICE, LLC, ) | |
| ) | _____ Civ. _____ (____) |
| Plaintiff, ) | **COMPLAINT** |
| vs. ) | |
| ) | **Jury Trial Demanded** |
| AMEDISYS HOLDING, L.L.C. ) and AMEDISYS, INC., ) | |
| Defendants. ) | |

_____

## COMPLAINT

Plaintiff Frontier Home Health and Hospice, LLC ("Frontier") brings this action against Defendants Amedisys Holding, L.L.C. ("Amedisys Holding") and Amedisys, Inc. (together with Amedisys Holding, "Amedisys"), and alleges as follows:

## NATURE OF THE ACTION

1.      This action concerns Amedisys's breaches and misrepresentations in the sale of a home health and hospice-care business to Frontier on April 17, 2014.  Amedisys represented to Frontier that the business was in compliance with all laws and regulations. Amedisys also represented that the business had earned certain stated amounts of revenue, including revenue from hospice patients whose care was covered by Medicare.

2.      Frontier learned after it acquired the business that Amedisys had routinely billed Medicare, contrary to law, for patients who were not eligible for hospice-care coverage. Amedisys's overbilling caused the government to pay claims for payment to which Amedisys was not entitled.  Amedisys's practices also inflated the business's hospice patient census and

revenue.

3.      The business purchased by Frontier is worth far less than represented by Amedisys.  It turns out that when the business follows Medicare rules—as it does now that Frontier owns it—fewer patients qualify for Medicare coverage, patients are on service for shorter periods of time and the business is far less profitable than Amedisys represented.

4.      Frontier seeks a declaration that Amedisys is responsible for determining and returning overpayments to the government, and that if Amedisys does not return overpayments to the government in a timely manner, it must indemnify Frontier for Frontier's costs and expenses in doing so.

5.      Frontier also seeks compensation for, among other things, the difference between the value of the business that Frontier bargained for and the value of the business it received.

## THE PARTIES

6.      Frontier Home Health and Hospice, LLC is a regional provider of home healthcare and hospice care.  Frontier is a limited liability company organized under the laws of Montana, with a principal place of business at 53 River Street, Milford, Connecticut.

7.      Amedisys, Inc. is a publicly-traded corporation organized under the laws of Delaware, with a principal place of business at 5959 S. Sherwood Forest Blvd., Baton Rouge, Louisiana.  On information and belief, Amedisys, Inc., together with its affiliates, is one of the nation's largest providers of home health and hospice services and operates in 37 states, including Connecticut, as well as the District of Columbia and Puerto Rico.

8.      Since April 22, 2014, Amedisys, Inc. has been operating under a Corporate Integrity Agreement with the Department of Health and Human Services.[1]  The Corporate

---

[1] Corporate Integrity Agreement between the Office of the Inspector General of the Department

Integrity Agreement is part of a settlement of claims that certain Amedisys offices improperly billed Medicare for ineligible home-health care patients and services.[2]

9.      On information and belief, Amedisys Holding, L.L.C., a subsidiary of Amedisys, Inc., is a limited liability company organized under the laws of Louisiana, and has a principal place of business at 5959 S. Sherwood Forest Blvd., Baton Rouge, Louisiana.

## JURISIDICTION AND VENUE

10.      Subject matter jurisdiction is based on 28 U.S.C. § 1332.  The parties are diverse, and the amount in controversy exceeds seventy-five thousand dollars, exclusive of interest and costs.

11.      This Court has personal jurisdiction over the defendants, and venue is appropriate in this District, because, among other reasons, this action arises out of the defendants' transaction of business in Connecticut.

## FACTUAL ALLEGATIONS

### HOSPICE CARE UNDER THE MEDICARE PROGRAM

12.      Hospice care helps patients live out their last days in comfort.  Hospice care is provided by a team of health care professionals who provide medical and emotional support to patients with a terminal condition.

---

of Health and Human Services and Amedisys, Inc. and Amedisys Holding, LLC (executed April 22, 2014), available at oig.hhs.gov/fraud/cia/agreements/Amedisys_04222014.pdf.

[2] U.S. Department of Justice, Amedisys Home Health Companies Agree to Pay $150 Million to Resolve False Claims Act Allegations (Apr. 23, 2014), available at http://www.justice.gov/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations.  The settlement agreement obligated Amedisys to pay the United States $150 million to resolve claims "that, between 2008 and 2010, certain Amedisys offices improperly billed Medicare for ineligible patients and services . . . and otherwise misrepresented patients' conditions to increase its Medicare payments.  These billing violations were the alleged result of management pressure on nurses and therapists to provide care based on the financial benefits to Amedisys, rather than the needs of patients."

13.     Congress enacted Title XVIII of the Social Security Act ("Medicare") in 1965 to pay for the costs of certain health services and health care.    Medicare pays for hospice care, but only if the patient's prognosis is a life expectancy of six months (180 days) or less.

14.     For the first 90-day period of hospice eligibility and coverage, the hospice must obtain a written or oral certification of terminal illness by the hospice medical director, and the patient's attending physician if the patient has an attending physician.

15.     For the subsequent 90-day period and each 60-day period thereafter, the hospice must obtain a written or oral re-certification from the hospice medical director or physician member of a hospice-care interdisciplinary group up to 15 days before, and no later than 2 days after, the beginning of the next period.

16.     The certifications must include specific clinical findings supporting a prognosis of a six-month life expectancy, and a narrative explanation of the findings supporting the clinical determination.  The clinical determination must follow objective guidelines, published in the form of a Local Coverage Determination by the Medicare audit contractor for the jurisdiction.

17.     Prior to the beginning of the patient's third benefit period, and each period thereafter, Medicare also requires a face-to-face encounter between a hospice physician or hospice nurse practitioner with each hospice patient.

**AMEDISYS REPRESENTS THE WYOMING BUSINESS'S FINANCIAL PERFORMANCE AND COMPLIANCE WITH LAW, INDUCING FRONTIER TO BUY THE BUSINESS**

18.     In late March 2014, Amedisys began discussions with Frontier about selling Amedisys Holding's 100% membership interest in Amedisys Wyoming, L.L.C., a home health and hospice-care business based in Wyoming (the "Wyoming Business"), to Frontier.

19.     In negotiating the sale, the parties mutually understood that the value of the Wyoming Business depended in significant part on Medicare revenue, and that the amount of

4

this revenue was a function of how many hospice patients the Wyoming Business could and did accommodate who qualified for coverage under applicable Medicare guidelines, and their length of stay.

20.    Amedisys presented Frontier with information about the Wyoming Business's operations, earnings and cash flows, including revenue received from Medicare.

21.    Amedisys also presented Frontier with information about the overall performance of the Wyoming Business in 2012, 2013, and the first months of 2014.  When Frontier inquired about the Wyoming Business's poor financial performance in February 2014, Amedisys claimed, falsely, that this was an anomaly.

22.    Based on the information presented and the representations made by Amedisys, Frontier decided to buy Amedisys's interest in the Wyoming Business.  It made this decision because, as Amedisys appreciated, Frontier believed that the Medicare patients were qualified recipients of Medicare benefits, and that the current and historical patient census and revenues accurately reflected the Wyoming Business's likely lawful patient census and revenues going forward.  Frontier expected, in other words, that the Wyoming Business's revenues and patient census fairly indicated its value as a going concern.

23.    Amedisys informed Frontier that it was important that a purchase agreement be signed quickly.  Having first discussed the sale of the business with Frontier on March 27, 2014, Amedisys insisted that any agreement be signed in mid-April 2014, before Amedisys, Inc. entered into the Corporate Integrity Agreement ("CIA") with the government.  Amedisys had obtained the government's consent that the business would not be subject to the CIA if Amedisys's interest was sold before the effective date of the CIA.  Because of the requirements of the CIA, Amedisys understood that the Wyoming Business would be worth much less, and in

fact prospective purchasers might not want to purchase it at all, if the business was subject to the CIA.

24.      On April 17, 2014, Amedisys Holding and Frontier entered into a Membership Interest Purchase Agreement (the "Agreement"), and the transaction closed.

25.      The extraordinarily compressed schedule effectively eliminated the opportunity for Frontier to conduct customary due diligence.  Moreover, although Frontier requested on-site diligence at the Wyoming Business, Amedisys denied the request, asserting that such pre-closing activity would alarm the staff.

26.      Amedisys provided a representation in the Agreement that Frontier was "entitled to rely upon the representations and warranties of [Amedisys] . . . despite any [due diligence] investigation." (Agreement § 9.3.)

27.      Substantively, Amedisys represented and warranted that "[t]he financial statements included in the Financial Information . . . delivered to [Frontier] present fairly, in all material respects, the financial position of [the Wyoming Business]."  (Agreement § 7.12(a)(i).)

28.      Amedisys also made a number of representations about the Wyoming Business's compliance with law, including in particular healthcare and Medicare laws.  Amedisys represented and warranted that:

- the Wyoming Business "has been and continues to be in material compliance with all Legal Requirements applicable to the Business, as appropriate, including all applicable Health Care Laws."  (Agreement §7.13(b)(i).)
- the Wyoming Business was "in compliance with all Legal Requirements except where the consequences of non-compliance could not reasonably have a Material Adverse Effect." (Agreement § 8.5(a).)
- "All . . . filings for professional and related services submitted by or on behalf of [the Wyoming Business] with respect to the Business to any Governmental Program . . . are accurate and complete in all material respects."  (Agreement § 8.4.)  The Agreement defined Medicare as a Governmental Program.  (Agreement § 8.6.)

6

29.     In addition to the Agreement, Amedisys, Inc. and Frontier entered into a guaranty pursuant to which Amedisys, Inc. absolutely and unconditionally guaranteed Amedisys Holding's obligations under or in connection with the Agreement (the "Guaranty"). (Guaranty §§ 1, 3.)

**FRONTIER LEARNS THAT AMEDISYS IMPROPERLY OBTAINED MEDICARE COVERAGE FOR HOSPICE PATIENTS**

30.     After the closing, Frontier became the sole owner of the Wyoming Business, which retained its existing Medicare Provider Agreement and billing number.

31.     As a new owner, Frontier began to assess the Wyoming Business's Medicare billing practices, patient eligibility, and staff knowledge of eligibility requirements.  On an initial visit to the Wyoming Business, Frontier's Vice President of Operations was alarmed to discover that an unusually high number of the hospice patients inherited from Amedisys had been receiving hospice care for over 180 days, *i.e.*, longer than their initial prognosis of a life expectancy of six months or less.  Of the 32 Medicare hospice patients Frontier inherited from Amedisys, 16 – *i.e.*, fully half – had been receiving hospice care for more than 180 days as of April 17, 2014.  By comparison, the national average for the percent of patients with stays over 180 days in 2013 was 11.5%.

32.     While a patient's prognosis can sometimes change, the prevalence of patients who receive hospice care for more than 180 days, and the lengths of stay, are indicators that patients may have been improperly certified as having a terminal condition and being eligible for hospice care under Medicare.

33.     Frontier's Vice President of Operations met the Wyoming Business's clinical staff—staff that had been managed by Amedisys—and proceeded to educate them about applicable Medicare eligibility requirements.  Frontier then requested that the staff assess

whether each of the existing Medicare patients who had received hospice care for more than 180 days under Amedisys's supervision was in fact eligible for hospice coverage.

34.     The staff, after conducting a review, promptly determined that 10 of these patients were ineligible for Medicare hospice coverage, and accordingly discharged them.

35.     Frontier has proceeded to audit more of Amedisys's certifications, measuring their propriety against the Local Coverage Determinations guidelines.  To date, Frontier has determined that 18 of the 32 Medicare hospice patients it inherited from Amedisys at the Wyoming Business, or 56%, did not meet eligibility requirements at the commencement of their hospice care when Amedisys owned the business.  The ineligibility of these patients was clear under the objective Local Coverage Determination guidelines, and there was no documentation of clinical factors supporting eligibility based on factors not set forth in the guidelines.  Notably, two-thirds of these ineligible patients were still alive as of April 2015.

36.     Amedisys either knew or was willfully blind or recklessly indifferent to the high incidence of improper certifications.  Since 2012, the Centers for Medicare and Medicaid Services has provided hospices with "Program for Evaluating Payment Patterns for Electronic Payment Reports," known as "PEPPER Reports."  According to the PEPPER User's Guide, the purpose of the report is "to assist the hospice in identifying potentially improper payments" from Medicare.

37.     The PEPPER Report compares the hospice patients' lengths of stay with national and regional averages, among other metrics.  One critical measure is how many of an agency's patients have lengths of stay exceeding 180 days.  If this number exceeds that of 80% of other hospice agencies, Medicare overbilling may be present.  As the PEPPER Reports state: "Percentiles at or above the 80th percentile for any target area indicate that the hospice may be at

higher risk for improper Medicare payments."

38.     Frontier recently obtained the Wyoming Business's PEPPER Reports for the periods prior to closing.  These reports – which Amedisys had not shared with Frontier prior to closing – reflected figures frequently exceeding or perilously close to the 80th percentile.

39.     Amedisys's PEPPER Report for the Lander-Riverton agency in Wyoming, for example, showed that the number of patients discharged (by death or alive) who had stays over 180 days, relative to all discharged patients, was above the national and regional 80th percentiles for the years ending September 30, 2011, and September 30, 2012, and over the 75th percentile regionally for the year ending September 30, 2013.

40.     Notably, the patients with stays over 180 days did not exceed the 180-day mark by mere days or weeks.  Rather, the PEPPER Report showed that under Amedisys's watch at the Lander-Riverton agency in 2011, 2012, and 2013, these patients had average lengths of stay of 396.9 days, 410.5 days, and 333 days, respectively.

41.     During the 2011-2013 period, the average length of stay for all Medicare hospice patients at the Lander-Riverton agency was generally twice as long as the national average.

42.     Significantly, after Frontier assumed responsibility for the operation of the Wyoming Business, the average lengths of stay promptly declined to lengths consistent with the national and regional averages.

43.     Frontier has learned that certain Amedisys practices encouraged employees to certify patients as eligible at the expense of compliance with Medicare requirements.  When questions or concerns arose among the local staff regarding patient eligibility and local management contacted the Amedisys Quality Manager assigned to the agency for guidance, the local leader would routinely be reassured by the Quality Manager that the patient(s) met

eligibility.

44.     Amedisys also implemented a bonus system for employees that effectively rewarded long lengths of stay.  Under the bonus system, agency leaders who played a role in overseeing patient eligibility, agency clinical staff, and Amedisys Regional Area Vice Presidents received positive "points" toward bonus consideration if the agency admissions and net income from operations were above, and the live discharge rate was below, certain pre-set thresholds. Because Amedisys did not distinguish between live discharges due to patient choice on the one hand, and live discharges due to improper initial certification or subsequent ineligibility on the other, Amedisys incentivized employees to not discharge ineligible patients.

45.     When all was said and done, Frontier learned that Amedisys had routinely been improperly billing Medicare by incorrectly certifying many patients as terminally ill.  Moreover, Amedisys incentivized employees to certify ineligible patients, and apparently ignored PEPPER Reports that raised red flags.

46.     Amedisys improperly inflated Medicare reimbursement for hospice patients, and thus misrepresented the Wyoming Business's revenues and profits and overall financial condition.  As a consequence, Frontier has acquired an interest in the Wyoming Business that is far less valuable than represented by Amedisys.

47.     As Frontier has continued to review the records of patients at the time of closing, Frontier has discharged the patients that it determined did not meet eligibility requirements, and instructed Amedisys to return overpayments to the government.  Under the Agreement, liabilities to Medicare relating to Amedisys's operation of the Wyoming Business prior to closing are liabilities retained by Amedisys.  (Agreement § 2.3(b)(ii).)

48.     Significantly, since the time of closing Amedisys has adjusted Medicare billings

related to just four patients and returned over $120,000 to Medicare.  Frontier knows about the details of the refunds only because they are reflected in the Wyoming Business's records in Medicare's claims processing system, to which Frontier now has access.  The Medicare hospice revenues represented by Amedisys prior to closing are therefore overstated, by Amedisys's tacit admission, by at least these amounts.

49.     To Frontier's knowledge, however, Amedisys has not complied with its obligations under the Agreement and under the law to determine and return all overpayments to the government.

## CLAIMS FOR RELIEF

## COUNT I: BREACH OF CONTRACT

50.     Frontier realleges and incorporates each allegation contained in the preceding paragraphs as if fully set forth in this paragraph.

51.     The Agreement, entered into by Frontier and Amedisys Holding, is a valid, binding contract.

52.     Frontier performed its obligations under the Agreement and has satisfied all conditions precedent to bringing this suit.

53.     In Section 7.12(a)(i) of the Agreement, Amedisys Holding represented and warranted that "[t]he financial statements included in the Financial Information . . . delivered to [Frontier] present fairly, in all material respects, the financial position of Amedisys Wyoming at the respective dates of the balance sheets included therein and the results of operations and statements of owners' equity and cash flows of Amedisys Wyoming, for the respective periods set forth therein."

54.     In Section 7.13(b)(i) of the Agreement, Amedisys Holding represented and

warranted that the Wyoming Business "has been and continues to be in material compliance with all Legal Requirements applicable to the Business, as appropriate, including all applicable Health Care Laws."

55.     In Section 8.4(a) of the Agreement, Amedisys Holding represented and warranted that "All reports, cap reports, cost reports, billings, claims or other filings for professional and related services submitted by or on behalf of Amedisys Wyoming with respect to the Business to any Governmental Program, including fiscal intermediaries and/or carriers and insurance carriers for any Government Program, or any Private Program, including any Third Party Payors, have been timely submitted in compliance with all applicable Legal Requirements and are accurate and complete in all material respects."

56.     In Section 8.5(a) of the Agreement, Amedisys Holding represented and warranted that the Wyoming Business was "in compliance with all Legal Requirements except where the consequences of non-compliance could not reasonably have a Material Adverse Effect."

57.     Frontier actually and justifiably relied on Amedisys Holding's representations and warranties in each of the above-referenced Sections, including the above-quoted language, and was induced to enter into the Agreement by each of these representation and warranties.

58.     Amedisys Holding materially breached these representations and warranties by submitting claims for payment to Medicare for hospice patients who, under applicable law, did not qualify for Medicare coverage, and by delivering and representing information to Frontier that materially misrepresented the Wyoming Business's financial position and compliance with law, including Medicare laws.

59.     In addition to the breaches and misrepresentations regarding patient eligibility, Amedisys Holding also materially breached the representations and warranties in Section

7.12(a)(i) by providing Frontier with revenue numbers for 2012, 2013, and 2014 that included revenue generated in prior periods.

60.    Amedisys Holding's breaches directly and proximately caused Frontier damage by conveying to Frontier a business worth substantially less than the business bargained-for by Frontier and represented by Amedisys.

61.    Under a Guaranty executed simultaneously with the Agreement, Amedisys, Inc. "irrevocably guaranties to [Frontier] (i) all obligations of [Amedisys Holding] to [Frontier] now existing or hereafter arising under or in connection with the [Agreement]." (Guaranty § 1.)  The Guaranty is absolute and unconditional.   (Guaranty § 3.)

62.    The Guaranty is a valid, binding contract.  Frontier has performed all of its obligations under the Guaranty and has satisfied all conditions precedent to bringing this claim.

63.    Amedisys Holding's breach of the Agreement creates an obligation of Amedisys Holding to Frontier arising under or in connection with the Agreement.  Accordingly, Amedisys, Inc. is liable for Amedisys Holding's breaches of the Agreement.

## COUNT II: NEGLIGENT MISREPRESENTATION

64.    Frontier realleges and incorporates each allegation contained in the preceding paragraphs as if fully set forth in this paragraph.

65.    Amedisys Holding owed a pecuniary duty to Frontier to provide accurate information in connection with the negotiation and signing of the Agreement.

66.    Amedisys Holding actually and materially breached that duty by making inaccurate representations and warranties in the Agreement, by inaccurately representing the financial position of the Wyoming Business and by inaccurately representing that it had properly obtained Medicare coverage for the Wyoming Business's hospice patients, when in fact those

patients were not eligible for Medicare.

67.     Amedisys Holding failed to exercise reasonable care when it communicated to Frontier the financial position of the Wyoming Business and that it had properly obtained Medicare coverage for the Wyoming Business's hospice patients, and in making contractual representations and warranties communicating the same.

68.     Amedisys Holding also failed to exercise reasonable care when it communicated to Frontier that the poor financial performance of the Wyoming Business in February 2014 was an anomaly.

69.     Frontier reasonably relied on Amedisys Holding's representations about the finances of the Wyoming Business and that it had properly obtained Medicare-covered hospice care for the Wyoming Business's patients.

70.     Frontier has suffered damages as a direct and proximate result of its reasonable reliance on Amedisys Holding's misrepresentations.

71.     Amedisys, Inc., as guarantor of Amedisys Holding's obligations under the Agreement, is liable for damages arising out of Amedisys Holding's negligent misrepresentation.

## COUNT III: UNFAIR AND DECEPTIVE TRADE PRACTICES, CONN. GEN. STAT.§ 42-110b

72.     Frontier realleges and incorporates each allegation contained in the paragraphs 1-49 as if fully set forth in this paragraph.

73.     Amedisys Holding's sale of a business that routinely obtained payments from Medicare for hospice patients who were ineligible for hospice coverage, without disclosure to Frontier of the improper payments, offends public policy, as expressed in statutes and regulations governing the certification of a patient for hospice coverage, including, *e.g.*, 42 U.S.C. § 1395f(a)(7);  is immoral, unethical, oppressive or unscrupulous; and has caused substantial injury

to Frontier.   Accordingly, in inaccurately representing to Frontier that it had properly obtained Medicare payments for hospice patients and by selling a business that collects such payments to a Connecticut company, Amedisys Holding committed an unfair trade practice.

74.     Amedisys Holding also committed a deceptive trade practice in inaccurately representing to a Connecticut company that it had properly obtained Medicare payments for hospice patients and by selling to a Connecticut company a business that collects such improper payments.  Amedisys Holding represented to Frontier that the Wyoming Business was in compliance with applicable Medicare law.  This representation was false and material.  The representation was likely to mislead a reasonable buyer, and in fact misled Frontier, in that Frontier, acting reasonably, relied on this representation in agreeing to purchase the Wyoming Business.

75.     By misrepresenting its compliance with applicable Medicare law, Amedisys Holding actually and proximately caused an ascertainable loss to Frontier, which Frontier could not have reasonably anticipated or avoided.

76.     Amedisys Holding's misrepresentations constituted an intentional and wanton violation of Frontier's rights, in that Amedisys Holding knew or was willfully blind and recklessly indifferent to whether its representations were true.

77.     Amedisys, Inc., as guarantor of Amedisys Holding's obligations under the Agreement, is liable for damages arising out of Amedisys Holding's unfair and deceptive trade practices.

## COUNT IV: DECLARATORY JUDGMENT

78.     Frontier realleges and incorporates each allegation contained in paragraphs 1-49 as if fully set forth in this paragraph.

15

79.     Under the Declaratory Judgment Act, the court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

80.     An actual controversy exists between Frontier and Amedisys Holding and Amedisys, Inc. regarding whether Amedisys Holding and Amedisys, Inc. have complied with their obligations to determine and return to the government any Medicare overpayments to the Wyoming Business.

81.     Frontier requests a declaration that, under the terms of the Agreement and Guaranty, Amedisys Holding and Amedisys, Inc. are obligated to determine and return overpayments to the government, and that if the Amedisys parties do not return overpayments to the government in a timely manner, they must indemnify Frontier for Frontier's costs in doing so.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in its favor against Defendants as follows:

   a.   Declaratory relief;

   b.   Compensatory damages;

   c.   Punitive damages;

   d.   Attorneys' fees and costs of this action;

   e.   Pre-judgment and post-judgment interest; and

   f.   Such other relief as the court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b) Frontier demands a trial by jury on all issues triable by a jury.

DATED: New Haven, Connecticut

April 2, 2015

Respectfully submitted,

By: <u>/s/ James I. Glasser</u>

James I. Glasser (ct 07221)
Jenny R. Chou (ct 28201)
WIGGIN AND DANA LLP
One Century Tower
New Haven, Connecticut  06508-1832
(203) 498-4400 (tel.)
(203) 782-2889 (fax)
jglasser@wiggin.com
jchou@wiggin.com

*Attorneys for Plaintiff Frontier Home Health and Hospice, LLC*